EDWARD R.L. ALEXANDER,

Plaintiff,

v.                                                    9:14-CV-548 (GLS/ATB)

BRIAN FISCHER, et al.,

Defendants.

EDWARD R.L. ALEXANDER, Plaintiff, *pro se*
MICHAEL G. McCARTIN, Ass't Att'y Gen., for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c) by the Honorable Gary L. Sharpe, United States District Judge.

In this civil rights action, plaintiff alleges various violations of his federal constitutional rights that occurred between December 2012 and September 2013 while confined by the New York Department of Corrections and Community Supervision ("DOCCS") at Clinton Correctional Facility ("Clinton"). (Compl., Dkt. No. 1). Specifically, plaintiff raises (1) due process claims arising from three separate disciplinary hearings (Compl. at 6-11); (2) First Amendment retaliation claims after his successful challenge of those hearings at the administrative and state level (Compl. at 6-7, 9-11; and (3) Eighth Amendment claims that Clinton correctional officers used excessive force during a cell inspection and improperly deprived him of food. (Compl. at 8-9, 12-14).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 30). Plaintiff has opposed the motion. (Dkt. No. 42). Defendants' reply only raised a procedural defect in plaintiff's statement of material facts. (Dkt. No. 45).

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted, and that all of plaintiff's claims be dismissed.

## DISCUSSION

## I.  Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467

F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

  To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general.  *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).   Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,* 2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Compliance with Local Rule (L.R.) 7.1

As required under L.R. 7.1, defendants have filed a Statement of Material Facts. (Dkt. No. 30-27)  Although plaintiff has responded to the Statement of Material Facts filed by Defendants (Dkt. No. 42-1), his response, with limited exception, does not follow the mandate of L.R. 7.1(a)(3).  Under this rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."  Instead, plaintiff has submitted a counter-statement of material facts that does not correspond to the defendants' statement.

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the local rule provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation

marks omitted). In deference to plaintiff's pro se status and his attempt, albeit inadequate, to respond to defendants' statement of material facts, the court has opted to review the entire summary judgment record.

## III. Due Process - Disciplinary Hearings and Appeals

Plaintiff claims that his due process rights were violated during three separate disciplinary hearings that were all conducted by defendant Captain David Lucia, resulting in confinement in the Clinton Special Housing Unit ("SHU"), and in one case, the imposition of a restricted diet. As set forth herein, the record evidence supports the conclusion that plaintiff was afforded due process in each of the three disciplinary hearings. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Lucia be granted. Summary judgment on these claims should also be granted with respect to defendants Thomas LaValley and Albert Prack, because their only involvement was to review plaintiff's appeals of the results of the disciplinary hearings that this court has found comported with due process.

### A. Legal Standards

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by

due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia, Wolff v. McDonnell*, 418 U.S. 539,

6

563-67 (1974)).  The hearing officer's findings must be supported by "some reliable evidence."  *Id*. (*citing, inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

## B.    Application

### 1.    December 2012 Disciplinary Hearing

On November 24, 2012, plaintiff declined a correctional officer's request to submit a urine sample for analysis, and received a misbehavior report charging him with refusing a direct order in violation of DOCCS Rule 160.10, and with violating the rule governing urinalysis testing, DOCCS Rule 180.14. (Lucia Decl., Ex. A, Misbehavior Report dated November 24, 2012, Dkt. No. 30-8 at 4-5).  Defendant Lucia conducted a Tier III disciplinary hearing with respect to these charges on December 4, 2012 and December 10, 2012.  (Lucia Decl., Ex. B, Hearing Transcript, Dkt. No. 30-9).

At the hearing, plaintiff denied that he had been provided employee assistance in preparation for the hearing, despite documentation that such assistance was provided. (Lucia Decl., Ex. A at 6-7; Lucia Decl., Ex. B at 2).  Plaintiff pled not guilty to both charges, and testified that Correctional Officer ("CO") Burgess, who was not named as a defendant, asked him "if he wanted to give urinalysis and I said no." (Lucia Decl.,  Ex. B at 4).  Plaintiff insisted that he was not actually ordered to submit a urine sample, but was merely given the option to do so. (*Id.*).

CO Burgess testified at the hearing that he gave plaintiff a direct order to submit a urine sample and that plaintiff refused. (Lucia Decl., Ex. B at 7).  This testimony was consistent with CO Burgess's misbehavior report, that described a direct order and

quoted plaintiff as saying "I'm not going to do this." (Lucia Decl., Ex. A at 4). A second witness, Sergeant McLean, testified that he had requested that plaintiff's urine be tested upon review of a confidential tip. (Lucia Decl., Ex. B at 11). McLean did not hear the initial interaction between plaintiff and CO Burgess, but testified that he also asked plaintiff whether he would comply with the urinalysis request, and plaintiff responded that "he had never complied with one before, he wasn't gonna comply with this one." (Lucia Decl., Ex. B at 9).

Prior to the hearing, plaintiff requested that Terrill Jewell, an inmate who was in the area when CO Burgess made the urinalysis request, be called to testify. (Lucia Decl., Ex. A, Assistant Form, at 8 & Ex. B at 4-5). Defendant Lucia asked plaintiff about the substance of the proposed testimony, but plaintiff said that he did not know because "I'm not psychic." (Lucia Decl., Ex. B at 4). Defendant Lucia concluded that the proposed inmate testimony was irrelevant and denied plaintiff's request. (*Id*. at 4-5). Despite this denial, Lucia investigated Jewell's potential testimony during an adjournment in the hearing, and found that the proposed witness was not in the cell when plaintiff was ordered to submit a urine sample. (*Id*. at 5). Defendant Lucia again concluded that Jewell's testimony would have no relevance to the issue of whether plaintiff refused an order to submit a urine sample, and advised plaintiff of the rationale for his decision. (*Id*.).

At the conclusion of the hearing, Lucia found plaintiff guilty of both charges and imposed a penalty of two months in SHU, and three months loss of recreation, packages, commissary, phone and visitation privileges. (Lucia Decl. ¶ 9; Ex. A at 1-2

& Ex. B at 14).  Plaintiff submitted administrative appeals to defendant LaValley and defendant Fischer, which were denied. (Pl.'s Decl. ¶ 11-12, Dkt. No. 42-1).  Plaintiff filed an Article 78 petition in New York State Supreme Court challenging the determination. (Compl. at 17).  On September 11, 2013, prior to a judicial determination on plaintiff's petition, DOCCS reversed the hearing decision and expunged it from plaintiff's record. (Compl. at 20; Pl.'s Decl., Ex. A, Administrative Reversal, Dkt. No. 42-2).  The memo accompanying the DOCCS determination notes that "per conversation with the [New York State] attorney general's office, witness issue was not properly addressed." (*Id*.).

Plaintiff's two month SHU sentence falls within the "short range" of disciplinary confinement.  *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (finding 30, 60 and 90 day SHU sentences within the short range of disciplinary sentences).  Therefore, plaintiff's confinement in SHU implicates a liberty interest only if "the conditions were more severe than the normal SHU conditions."[1] *Palmer,* 364 F.3d at 64.  "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Id.* (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998)). The loss of visitation and related privileges, the only other deprivations identified by

---

[1] "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir.2004).

plaintiff, do not rise to the level of an "atypical and significant hardship," so as to create a liberty interest protected by procedural due process. *Borcsok v. Early*, 299 Fed. Appx. 76, 78 (2d Cir. 2008). Thus, because plaintiff had no liberty interest, no due process violation could flow from the facts set forth in his complaint.

In any event, even assuming that plaintiff had a liberty interest, a review of the record demonstrates that plaintiff received adequate due process, and that plaintiff's arguments to the contrary are meritless. Plaintiff's due process challenge to the December 2012 hearing centers on the allegation that he was "totally denied" his right to call witnesses when defendant Lucia refused to have inmate Jewell testify at the hearing. (Compl. ¶ 3).

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process right to witnesses is only violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.'" *Ponte*, 471 U.S. at 497.

At the December 2012 hearing, defendant Lucia questioned plaintiff about the purpose for Jewell's testimony, and plaintiff either did not know or refused to answer.

10

(Lucia Decl., Ex. B at 4-5). It was not unreasonable for defendant Lucia to ask plaintiff to justify his request for a particular witness, and the hearing officer could have denied the request based upon plaintiff's refusal to explain the reason for calling the witness. However, the record shows that Lucia followed up and determined that Jewell was not in the cell at the time that plaintiff was ordered to produce a urine sample. (Lucia Decl., Ex. A, Witness Interview Notice, at 9). In light of these findings, Lucia made a written determination that Jewell's proposed testimony had "no relevance in regards to inmate Alexander's refusal to follow staff directions." (*Id.*). This exclusion of testimony deemed irrelevant or unnecessary does not violate due process. *Kawalinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citing *Kingsley v. Bureau of Prisons*, 937 F.2d at 30); *Chavis v. vonHagn*, No. 02-CV-119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009).

## 2. February 2013 Disciplinary Hearing

On the morning of February 1, 2013, plaintiff received two misbehavior reports charging him with refusing a direct order in violation of DOCCS rule 106.10, refusing a search or frisk in violation of DOCCS Rule 115.10, creating a disturbance in violation of DOCCS Rule 104.13, and Interference with an Employee in violation of DOCCS Rule 107.10. (Lucia Decl., Ex. C, Misbehavior Report dated February 1, 2013, Dkt. No. 30-10 at 4). These charges stemmed from a verbal confrontation during a pat frisk and search outside plaintiff's SHU cell, during which plaintiff turned his head toward the correctional officers conducting the frisk, and the officers used force to bring plaintiff to the ground and restrain him. (*Id.*). Upon inspection of a list

of names found in plaintiff's sock during the search, plaintiff was also charged with gang activity in violation of DOCCS Rule 105.13. (Lee Decl., Ex. B, Misbehavior Report dated February 1, 2013, Dkt. No. 30-16 at 16). Defendant Lucia conducted a Tier III disciplinary hearing with respect to all charges on February 12, 2013. (Lucia Decl., Ex. D, Hearing Transcript, Dkt. No. 30-11). Plaintiff pled not guilty to all charges. (Lucia Decl., Ex. D at 3).

Lucia reviewed the evidence related to the gang charge first. K. Norcross, a counselor at Clinton, generally described his experience and training in monitoring gang activity at DOCCS facilities, and testified that he reviewed the paper found in plaintiff's sock. (Lucia Decl., Ex. D at 10-16). According to Norcross, the two-sided sheet taken from plaintiff contained a list of names and nicknames, with various descriptors including "Gangsters," "Black Diamonds," and "Black Roses." (Lucia Decl., Ex. C at 9-10). After comparing the list with a DOCCS database of gang affiliations, Norcross concluded that the sheet included names and aliases of Blood gang members, broken down by various sects. (Lucia Dec, Ex. C at 11 & Ex. D at 10-11). Norcross testified that plaintiff was affiliated with the Bloods, and had previous gang-related disciplinary violations in his record. (Lucia Decl., Ex. D at 11).

Sergeant Orzech, CO Lee and CO Christon separately testified about the search that resulted in discovery of the contraband list, including the officers' orders to the plaintiff, plaintiff's behavior during the search, and the use of force. (Lucia Decl., Ex. D at 19-24, 30-31). CO Christon testified that during the standard pat and frisk, a piece of paper was found in plaintiff's left sock. (*Id*. at 19-20). Sergeant Orzech

testified that plaintiff put his left foot on the ground and engaged in a verbal confrontation with the officers while his sock was being removed. (*Id*. at 21). Officer Lee, who wrote the first misbehavior report regarding the incident, testified that plaintiff was given several direct orders to face the wall, to stop pushing off from the wall with his hands, and to stop turning his head toward the officers. (*Id*. at 30). Lee admitted that the specifics of the orders were not included in his misbehavior report. (*Id*.).

Following this testimony, Defendant Lucia reviewed the surveillance video of the February 1, 2013 incident several times with plaintiff.[2] (Lucia Decl., Ex. D at 31-39). Plaintiff offered his description of the events in the video, and disputed the testimony of each witness regarding the incident. (*Id*.) Plaintiff argued that there was no proof that he had engaged in any gang activity, or that he had failed to comply with any orders while the frisk was taking place. (*Id*. at 39-41).

At the conclusion of the hearing, Lucia found plaintiff guilty of gang activity, creating a disturbance, and interference with an employee. (Lucia Decl., Ex. D, at 41). He found plaintiff not guilty of two charges: refusing a search or frisk, and refusing a direct order. (*Id*.). Lucia stated that he based his determination on the testimony of Sergeant Orzech, CO Lee, CO Christon, K. Norcross and plaintiff, as well as the video evidence. He imposed a penalty of six months in SHU with loss of recreation, packages, commissary and phone privileges. (*Id*.) Plaintiff submitted an

---

[2] A full description of the video's contents is set forth in the Excessive Force analysis in Section IV(B)(1), *infra*.

administrative appeal. On April 29, 2013, DOCCS modified the determination, finding that the misbehavior report did not substantiate the charges of Interfering with an Employee and Creating a Disturbance. (Pl. Decl., Ex. B, Prack Memo, Dkt. No. 42-2 at 7). The modification did not address the gang charge or alter plaintiff's sentence.

Since the disciplinary hearing resulted in a six month sentence to SHU, plaintiff is considered to have a liberty interest subject to due process protection. *Sandin*, 515 U.S. at 484. Beyond plaintiff's common refrain of a retaliatory motive on the part of defendant Lucia (addressed in Section V, *infra*), he argues that defendant Lucia's February 2013 determination violated his right to due process because it was inconsistent with the video evidence. Plaintiff also argues that the invalidity of Lucia's decision is demonstrated by the fact that it was modified upon administrative appeal. Neither of these arguments supports a due process claim.

Plaintiff's argument that defendant Lucia violated due process by misinterpreting the video evidence does not raise a valid constitutional question. The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004) (citing *Superintendent v. Hill*, 472 U.S.445, 454 (1985)). In this case, defendant Lucia heard testimony from a DOCCS employee with experience in monitoring gang affiliations, who concluded that the list found in plaintiff's socks contained the names, aliases, and sect of various members of the Blood gang. He also heard testimony from three correctional officers

who were directly involved in the incident. In addition to examining the list found in plaintiff's sock that included several references to "Gangsters," defendant Lucia also reviewed surveillance video and allowed plaintiff an opportunity to explain his version of the events depicted therein. (Lucia Decl., Ex. D at 31-39). As the hearing officer, defendant Lucia was authorized to make an independent assessment of the evidence, including witness testimony. *See Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at *11 n.25 (N.D.N.Y. Aug. 5, 2010) (Baxter, M.J.) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep.-Rec. adopted*, 2010 WL 3762016, at *1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.). By doing so, Lucia's determination at the February 2013 hearing was supported by "some" evidence, and therefore satisfied due process.

The subsequent modification of defendant Lucia's determination during the administrative appeals process or in anticipation of state court litigation does not impact the due process analysis. The outcome of an administrative appeal or a state court proceeding does not, by itself, resolve the question of whether a constitutional violation occurred. *Walker v. Bates*, 23 F.3d 652, 657 (2d Cir. 1994); *Bunting v. Nagy*, 452 F. Supp.2d 447, 453-54 (S.D.N.Y. 2006); *Bogle v. Murphy*, No. 98-CV-6473, 2003 WL 22384792, at *5-6 (W.D.N.Y. Sept. 9, 2003); *see also Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998); *Madera v. Goord*, 103 F. Supp.3d 536, 541 (N.D.N.Y. 2000) (violation of state regulations, by itself, does not give rise to a constitutional claim). The New York state law standard for sufficiency of

evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin*, 76 N.Y.2d 964 (1990). This stricter standard is not applicable to federal due process claims. *See Sira v. Morton*, 380 F.3d 57, 76 n.9 (2d Cir. 2004).

### 3.    August - September 2013 Disciplinary Hearing

On August 20, 2013, plaintiff received a misbehavior report from CO LaFountain. (Lucia Decl., Ex. F, Misbehavior Report dated August 20, 2013, Dkt. No. 30-13 at 4). In the report, LaFountain stated that he was conducting rounds when plaintiff asked him a question regarding a package. When plaintiff disagreed with LaFountain's response, plaintiff "became verbally aggressive and started making threats toward staff, specifically DSS Brown." (*Id.*) Plaintiff was charged with creating a disturbance in violation of DOCCS Rule 104.13, Interference with an Employee in violation of Rule 107.10, Harassment in violation of DOCCS Rule 107.11, and Threats in violation of DOCCS Rule 102.10. (*Id.*)

Defendant Lucia held a disciplinary hearing on September 3, 2013.[3] After consideration of the evidence, including audio and video of the incident, Lucia found plaintiff found guilty of all charges and placed plaintiff on a restricted diet[4] for seven days, beginning on September 5, 2013. (Lucia Decl., Ex. F, Dkt. No. 30-13 at 1). Lucia wrote that the purpose for this penalty was "[t]o impress upon this inmate that

---

[3] Neither party has submitted the transcript of this hearing.

[4] As described by plaintiff in his deposition, the restricted diet is a loaf of bread, typically containing carrots, that is served with a portion of raw cabbage. (McCartin Decl., Ex.A, Deposition Transcript, Dkt. No. 30-3 at 55, 76).

this type of behavior will not be tolerated. Previous dispositions have failed to dissuade this inmate from similar conduct. Inmate SHU/KL confinement exceeds his maximum release date." (Lucia Decl., Ex. F at 2). The disposition also noted that facility medical staff had cleared plaintiff for a restricted diet. (*Id*.)

Plaintiff's due process claim with regard to this hearing fails because the resulting sentence, a seven day restricted diet, did not create an atypical and significant hardship sufficient to implicate due process rights. *See Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *5-6, (N.D.N.Y., Dec. 9, 2014); *see also Smith v. Burge*, 2006 WL 2805242, at *1, 12-14 & n.88 (dismissing substantive and procedural due process claims relating to a pre-hearing imposition of a restricted diet for seven days) (*citing, inter alia*, *McEachin v. McGuinnis*, 357 F.3d at 199, 200, 201).

Even if a liberty interest were involved, summary judgment for defendants would still be appropriate. Plaintiff's only due process claims related to the August-September 2013 hearing are that imposition of a restricted diet was an inappropriate penalty under DOCCS policy, and that defendant Lucia did not allow plaintiff to call three eyewitnesses at the hearing.

Defendants have not countered plaintiff's allegation that his placement on a restricted diet violated DOCCS' regulations, but a violation of state regulation or policy, by itself, does not give rise to liability under § 1983. *Young*, 160 F.3d at 902; *Madera*, 103 F. Supp.3d at 541. Likewise, where the hearing officer found that audio and videotape of the incident "clearly indicated" that the violations occurred, his decision not to call alleged inmate eyewitnesses who were in the general area at the

time would not amount to a constitutional violation. *See, e.g., Kawalinski v. Morse*, 201 F.3d at 109 (exclusion of testimony deemed unnecessary does not violate due process).

Plaintiff alleges that the entire August-September 2013 disciplinary hearing was prompted by a false misbehavior report from defendant LaFountain. This conclusory allegation does not alter the analysis above. A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process.[5] *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986).

## IV. Eighth Amendment Claims

### A. Legal Standards

#### 1. Conditions of Confinement

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from

---

[5] If a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). As explained in Section V, *infra*, defendant LaFountain should also be granted summary judgment as to the substantive due process issues raised by plaintiff's retaliation claim.

conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order

for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

### 2. Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

B. **Application**

1. **Conditions of Confinement - Denial of Food**

While plaintiff objects to his placement on a restricted diet in September 2013 as a violation of due process and DOCCS policy, that penalty does not raise an Eighth Amendment issue under the circumstances, where the diet was approved by medical staff. Courts in this circuit routinely have dismissed Eighth Amendment claims based on dietary restrictions imposed for disciplinary reasons, finding that the inmates failed to establish sufficiently "serious" deprivations. *See, e.g., McEachin v. McGuinnis*, 357 F.3d 197, 199-200 (2d Cir. 2004) (affirming district court's dismissal of Eighth Amendment claim alleging, *inter alia*, that inmate was placed on a restricted diet consisting of "loaf" for seven days pending a disciplinary hearing); *Smith v. Burge*, No.

9:03-CV-955 (LEK/GHL), 2006 WL 2805242, at *1, 11 & n.78 (N.D.N.Y. Sept. 28, 2006) ("[a]t most, Plaintiff was deprived of food that tasted good for a period of seven days") (collecting cases); *Willey v. Kirkpatrick*, No. 07-CV-6484, 2013 WL 434188, at *10 (W.D.N.Y. Feb. 4, 2013).

Here, however, plaintiff alleges a far more onerous punishment. Plaintiff claims that while he was formally sentenced to a seven day restricted diet, defendant LaFountain and other unnamed correctional officers denied him all meals of any kind for seven days, at the direction of defendant Lucia and with the knowledge and approval of defendants LaValley and Brown.[6] Plaintiff further alleges that defendant Lucia ordered sandbags to be placed in front of his cell door to prevent him from "fishing" for food shared by other inmates.[7] "Under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) (citations omitted); *Moss v. Ward*, 450 F. Supp. 591, 596-97 (W.D.N.Y. 1978) (disciplinary penalty that denied inmate all food for four days violated the Eighth Amendment). Defendants counter

---

[6] Plaintiff alleges that he wrote to both defendant LaValley and defendant Brown to tell them that he was wrongfully placed on a restricted diet and that he was being denied all meals. (Compl. ¶ 59). Plaintiff also states that defendants LaValley and Brown responded in person and in writing "that no wrong doing was done and that plaintiff was rightfully placed on a restricted diet." (Compl. ¶ 60). Plaintiff furthers states that LaValley observed the sandbags in front of plaintiff's cell, and explained their purpose. Therefore, this court concludes that plaintiff has adequately alleged personal involvement of these supervisory officials as to these claims. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986). A more detailed discussion of the case law addressing personal involvement is set out in Section VI, *infra*.

[7] As described by plaintiff in his deposition, "fishing" is the use of a line, typically made of string or a torn bed sheet, attached to paper or some other weight so that it can be pushed underneath a cell door to trade food, magazines or contraband material between cells. (McCartin Decl., Ex. A at 66-67).

that if plaintiff did not eat for the seven days that he was on a restricted diet, it was because he did not like the food offered and declared a hunger strike. (Lucia Decl. ¶ 25; Ryan Decl., Dkt. No. 30-22, ¶¶ 8-9). Regardless of plaintiff's motivation, this court recommends that summary judgment be granted for defendants because plaintiff "has failed to come forward with anything of evidentiary value establishing that he was in fact deprived of food, not by his own actions but rather those of prison officials." *Cruz v. Church*, No. 9:05-CV-1067 (GTS/DEP), 2008 WL 4891165, at *12 (N.D.N.Y. Nov. 10, 2008)

As a general rule, at the summary judgment stage, courts must not weigh evidence or assess the credibility of witnesses. *Scott v. Coughlin*, 344 F.3d 282, 290-91 (2d Cir. 2003). However, in the "rare circumstances where plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys*, 426 F.3d at 554; *see also Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (conclusory allegations are insufficient to state a claim for relief under section 1983); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

In this case, it is not simply plaintiff's word against the officers'. Defendants have produced the SHU logs that document that plaintiff was provided the "loaf"

between September 5, 2013 and September 11, 2013 and refused it. (Beudette Decl., Dkt. No. 30-21, Ex. A.). On September 5, the first day of the restricted diet, the log shows that plaintiff refused his meals at 7:20 a.m., 11:25 a.m. and 4:00 p.m. (Beudette Decl., Ex. A at 5). On September 6, 2013, the log shows plaintiff refusing his meals at 11:17 a.m and 4:00 p.m. (*Id*. at 8-9). On September 7, 2015, the SHU log shows plaintiff refusing his meals at 7:35 a.m., 11:25 a.m., and 4 p.m (*Id*. at 10-12). The 4 p.m. entry on September 7 notes that this was the ninth consecutive meal that plaintiff had refused, and that supervisors had been notified. (*Id.* at 12).

On September 8, 2013, the SHU logs shows that plaintiff refused his meal at 7:30 a.m and 4:50 p.m., and also refused to have medical staff take his vital signs and weight that morning. (*Id*. at 13). On September 9, 2013, the SHU logs document plaintiff refusing meals at 7:32 a.m., 10:55 a.m., and 4:47 p.m. (*Id*. at 16). The September 10, 2013 SHU logs show plaintiff refusing meals at 7:13 a.m., 10:50 a.m., and 4 p.m. (*Id*. at 20-21, 23). The September 11, 2013 SHU log, only a portion of which was provided, shows that plaintiff refused his meal at 7:50 a.m. (*Id*. at 24). SHU logs from September 12 -14, when plaintiff was off the restricted diet, do not mention any refusal by plaintiff. (Id. at 25-31).

SHU logs, that "would not likely reflect the wrongful denial of meals to an inmate by a corrections officer," do not, standing alone, establish as a matter of law that plaintiff was provided food. *Moncrieffe v. Witbeck*, No. 97-CV-952, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000). However, defendants have also provided medical records that demonstrate that the facility was regularly monitoring plaintiff's

physical and mental condition, ensuring that he was drinking fluids, and making sure that he was compliant with his medication. (Ryan Decl., Ex. A., Dkt. No. 30-23). Plaintiff regularly refused the medical treatment offered, including taking his weight and vital signs. (*Id*. at 1-2, 4). Defendants have also submitted a declaration by Kathleen Ryan, a registered nurse who examined plaintiff on September 7, 2015, when plaintiff was allegedly being denied food. According to Ryan, plaintiff informed her that he was refusing to eat due to an alleged "inability to eat the 'loaf'", and she noted these remarks in her status report. (Ryan Decl. ¶ 5, Ex. A at 1). Plaintiff's medical records also reference a hunger strike. (Ryan Decl., Ex. A at 2, 4-5). Medical records that contradict plaintiff's allegations may be relied on for summary judgment. *See Brown v. White*, 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco*, 92 Civ. 7670, 1995 WL 444352 at n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue).

Defendants also point to plaintiff's deposition in this litigation, during which he testified that he had previously refused several meals while on the restricted diet in April 2013. (McCartin Decl., Ex. A at 72, 75-6). Plaintiff testified during the deposition that he did not like to eat the "loaf," which typically contained carrots,

because "I am allergic to them. I won't eat them. It makes me throw up."[8] (*Id.*).

Defendants also provided test results showing that medical staff had tested plaintiff for food allergies prior to his placement on the restricted diet and found none. (Lucia Decl., Ex. F at 5). Because plaintiff has not provided any evidence to support his claim that he was deprived food for seven days, and defendants have offered several sources of documentary evidence that plaintiff was provided nutritionally sufficient, if unappetizing, food during the same time period, summary judgment should be granted for defendants Lucia, LaValley, Brown and LaFountain on this Eighth Amendment claim.

Plaintiff's claim that defendant Lucia ordered sandbags placed in front of his cell to prevent him from fishing for food from other inmates does not change this analysis.[9] Plaintiff conceded at his deposition that the surreptitious exchange of food between inmates was a violation of DOCCS rules. ((McCartin Decl., Ex. A at 87-90). Therefore, the installation of the sandbags served a legitimate penological purpose.

---

[8] Defendants also point to a portion of plaintiff's deposition in which plaintiff was asked whether he was provided a carrot-free loaf in September 2013, and whether he ate it. Plaintiff responded "yes" to both questions, without elaboration. (McCartin Decl., Ex. A at 79). Defendants contend that this undermines plaintiff's claim that he was denied food. This court has not relied on these curt responses in its recommendation to grant summary judgment for defendants because the responses are inconsistent with the majority of plaintiff's testimony during the same deposition. (*Id.* at 65-66, 82-84, 91). *See Palazzo v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000) (factual question may still exist where issue was not "thoroughly or clearly" explored in deposition and party may be able to amplify or explain in subsequent sworn testimony).

[9] Plaintiff filed a declaration with the court that his personal property includes copies of surveillance video that show the sandbags being placed in front of his cell. Because defendants do not dispute that Lucia ordered the sandbags to be placed there, these videos would not change this court's decision.

Aside from preventing the exchange of food among inmates, plaintiff does not allege that the sandbags interfered with air circulation or created any other condition different from the standard SHU cell. Therefore, there is no credible Eighth Amendment argument to be made. *See Demaio v. Mann*, 877 F.Supp. 89, 93 (N.D.N.Y. 1995) (installation of plexiglass shield around cell door to prevent spitting or throwing food at staff did not violate Eighth Amendment); *Ruffin v. Taylor*, 166 F. Supp. 2d 999, 1007-08 (D. Dela. 2001) (temporary installation of chain and padlock on cell door to prevent inmate from tampering with lock did not give rise to constitutional claim).

### 2. Excessive Force

Plaintiff's complaint states that on February 1, 2013, he was removed from his SHU cell by several officers, was handcuffed behind his back[10], and told to face the wall. (Compl. ¶ 24). Plaintiff further claims that defendant Lee grabbed plaintiff from behind, with one hand on his neck and the other holding the handcuffs, and slammed plaintiff to the floor. (Compl. ¶ 25). Plaintiff claims that the right side of his face was slammed into the floor, causing the inside of his mouth to bleed and one of his upper right tooth to become loose. (Compl. ¶ 26). As described by plaintiff, defendant Lee then used his knee to kick plaintiff's lower back while plaintiff was on the floor. (Compl. ¶ 26). Defendant Lee and other correctional officers then placed plaintiff in leg chains and escorted him to the holding pen. (Compl. ¶ 28).

During his deposition, plaintiff testified that he did not receive any direct orders

---

[10] During his deposition, plaintiff testified that he was handcuffed in the front and had a chain that extended around his waist. Based on the video provided by defendants, plaintiff was actually handcuffed with his hands in front of him, and a chain around his waist.

when he was removed from the cell, and "All I did was I turned my head to the sergeant, and turned back around . . . . I was facing the wall. I didn't move or anything, and I was thrown to the floor." (McCartin Decl., Ex. A at 32). Plaintiff testified that after his face struck the floor, defendant Lee kneed him twice in the mid-back and held his head down while the other officers applied leg shackles. (*Id.* at 33). Plaintiff testified that he attempted to bring his face up from the floor, and defendant Lee pushed it back down. (*Id*. at 36). He denied that defendant Lee or any other correctional officer told him to stay still on the ground and not to try and lift his face off the floor. (*Id.*). Plaintiff testified that the incident took "maybe two or three minutes." (*Id*. at 35). Plaintiff testified that he suffered back pain that radiated to his right knee since the incident, and that one of his upper right teeth was loose and caused some pain when he chewed. (*Id*. at 37). He had seen a dentist since the incident but did not receive or request any treatment for the damaged tooth. (*Id*. at 37-38).

Defendant Lee submitted a memo dated February 1, 2013, describing his use of force against plaintiff. (Lee Decl., Ex. A, Memo, Dkt. No. 30-15). Lee stated that during a pat-frisk at approximately 9:30 a.m. on February 1, 2013, he took control of plaintiff's waist chain with his left hand. (*Id*.). As described by Lee, plaintiff became agitated, attempted to turn his head toward staff, and did not comply with several direct orders to face the wall. Defendant Lee said that he placed his right hand on the back of plaintiff's head in an attempt to gain compliance, and plaintiff began pushing off the wall. Defendant Lee stated that "while maintaining control of [plaintiff's] waistchain with my left hand a body hold of his right shoulder with my right hand, I forced Inmate

Alexander to the floor. Leg restraints were applied by other staff." (*Id.*). Defendant LaFountain and C.O. McMillian, who were involved in the pat-frisk,[11] submitted contemporaneous reports matching defendant Lee's description. (Lee Decl., Ex. B, Use of Force Reports, Dkt. No. 30-16, at 5, 9-12).

Defendant Lee also submitted a declaration in support of summary judgment, expanding on the description contained in his original report. (Lee Decl., Dkt. No. 30-14). Lee stated that he came over to assist fellow officers who were frisking plaintiff and removing his socks to look for contraband. (Lee Decl. ¶ 9). Lee testified that at the time that he arrived, plaintiff was not complying with the frisk. (*Id.* at ¶ 11). After plaintiff refused several orders to face the wall and began pushing himself away from the wall, defendant Lee told plaintiff that if he kept pushing himself off the wall, defendant Lee would take him to the ground. (*Id.*). When plaintiff again pushed himself off the wall, according to Lee, "I used force to swiftly place plaintiff on the floor." (*Id.* at ¶ 12).

Defendants have submitted a surveillance video of the incident that supports defendant Lee's version of events.[12] (Lucia Decl., Ex. E, Dkt No. 30-12). The video is

---

[11] Plaintiff does not accuse defendant LaFountain of excessive force. C.O. McMillian has not been named as a defendant in this proceeding.

[12] The court may rely on the video of the relevant events in concluding that no reasonable fact finder could credit the plaintiff's inconsistent claims about the incident. *See, e.g.*, *Kalfus v. New York and Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012) (the video demonstrated that plaintiff resisted arrest by refusing to stand up or be handcuffed, and that the patrolmen used only reasonable force to overcome his resistance; no reasonable fact finder could conclude that defendants applied excessive force); *Green v. Morse*, 00–CV–6533, 2009 WL 1401642, at *27 (W.D.N.Y. May 18, 2009) (this court may rely on the video evidence clearly showing that some use of force was necessary to grant summary judgment and dismiss plaintiff's

approximately six minutes long and documents the removal of plaintiff from his cell, the pat-frisk, the arrival of defendant Lee, the use of force, and the movement of plaintiff to a holding cell. (*Id.*) The video depicts two correctional officers approaching plaintiff's cell and handcuffing him in the front through a slot in the door. (*Id.* at 0:13). Plaintiff was then removed from the cell and stood with his arms extended in front of him, against the wall. (*Id.* at 0:23). After an initial pat-down, a third officer arrived to assist. (*Id.* at 0:43). Plaintiff was directed to press up against the wall and one officer had him lift each foot in order to check his foot, sock, and pant leg. (*Id.* at 0:52). When plaintiff began to lower his left foot, he was ordered to pick his foot back up. (*Id.* at 1:07). Plaintiff turned his head to the officers, and was directed to face the wall. (*Id.* at 1:11). After plaintiff's left sock was inspected, one officer remarked, "He's got something in there." (*Id.* at 1:20). Several officers ordered plaintiff against the wall, and pushed his him closer to the wall. (*Id.* at 1:25). When plaintiff began to push himself further away from the wall, an officer instructed him, "Don't push back," and asked plaintiff several times if he could hear him. (*Id.* at 1:32). At this time, defendant Lee arrived.[13] (*Id.* at 1:36). The officers advised plaintiff that they were going to take his sock off to inspect what was hidden inside it. (*Id.* at 1:49). Several officers, including defendant Lee, then pressed plaintiff against the wall. (*Id.* at 2:03). One officer warned plaintiff "That we can do this the easy way or we are going to have to

___

excessive force claim) (citations omitted).

[13] Defendant Lee is not identified by name in the video, but this officer's actions generally correspond to both plaintiff's and defendants' description of Lee's use of force.

put you on the ground to do it." (*Id*. at 2:17).  Defendant Lee, who had his left hand on plaintiff's neck, told plaintiff that he did not have to turn his head toward the officers, and to face the wall. (*Id.* at 2:24).  Another officer advised plaintiff "don't play games," and plaintiff's verbal response is inaudible on the video. (*Id*. at 2:48).  An officer removed plaintiff's left sock and took a folded sheet of paper from the sock. (*Id*. at 3:04).  Plaintiff turned his head to the left, and an officer advised him again to face the wall. (*Id*. at 3:28).  An officer put plaintiff's left sock back on his foot, and plaintiff turned his head to the right. (*Id*. at 3:50).  Several officers repeated the order to face the wall. (*Id*. at 4:00).  Defendant Lee said that plaintiff was pushing against him.  (*Id*. at 4:05).  Plaintiff's verbal response is inaudible on the video. (*Id*. at 4:06).  Defendant Lee told plaintiff that this was his last chance or he was going on the floor.  (*Id*. at 4:12).  Defendant Lee told plaintiff twice more to stop pushing backwards, and then pulled plaintiff down to the floor face first. (*Id*. at 4:17).  Once on the floor, defendant Lee told plaintiff, "That's enough" and to stop resisting. (*Id*. at 4:24).  While the officers were putting plaintiff's slippers or shoes back on, defendant Lee told plaintiff to stop trying to get up. (*Id*. at 4:45).  On the video, defendant Lee's left hand and left knee appear to be pressed against plaintiff's back while the other officers shackled plaintiff's legs. (*Id*. at 4:50-5:35).  When the leg shackles were in place, the other officers lifted plaintiff to his feet and escorted him down the hallway. (*Id*. at 5:42).  The video shows that the period between plaintiff being taken to the ground to being escorted away took approximately one and a half minutes.

The video corroborates defendant Lee's statement that plaintiff was directed

31

several times to face the wall, and turned several times toward the officers.  Defendant

Lee also ordered plaintiff several times to stop pushing off the wall.  When plaintiff

was pulled facedown to the floor, defendant Lee had a knee on his back but did not

appear to use his knee to kick plaintiff twice, as alleged in the complaint.  Once the leg

shackles were applied, plaintiff was lifted to his feet and escorted down the hallway

without further incident.

Plaintiff has not submitted any evidence to counter defendants' video or to show

that he suffered more than a *de minimis* injury from the use of force.  Although the lack

of injury is not fatal to an excessive force claim, the extent and nature of an injury, if

any, "'is probative of the amount and type of force actually used . . . and that in turn is

likely to reflect on the reasonableness of that force[.]'" *Cunningham v. McCluskey*, No.

05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (quoting *Yang Feng*

*Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009); *Washington v.*

*Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008) (finding de minimus injury to be

probative of de minimus force)), *Rep.-Rec. adopted,* 2011 WL 3478312 (S.D.N.Y. Aug.

8, 2011).

In his complaint, plaintiff alleges that he suffered a cut to his mouth and a loose

tooth.  (Compl. ¶ 26).  During his deposition, plaintiff stated that one of his teeth on the

right side was "a little loose" and when "I chew on it, it kind of bothers me."

(McCartin Decl., Ex. A at 37).  He also reported that he has required medication for

back pain since the incident.  (*Id*. at 39-4).  Defendants have filed the declaration of

Susan Devlin-Varin, a registered nurse, who examined plaintiff shortly after the use of

force and concluded that plaintiff had no observable injuries. (Devlin-Varin Decl., Ex. A &B, Dkt. Nos. 30-25, 30-26). Photographs taken of plaintiff immediately after the use of force do not show any obvious cuts, bruises or other injuries on his body. (LaBonte Decl., Exs. A & B, Dkt. Nos. 30-18, 30-19). In her declaration, Devlin-Varin noted that plaintiff did not have any blood on his face or in and around his mouth during her evaluation. (Devlin-Varin Decl., Dkt. No. 30-24 at ¶ 5). During the examination, plaintiff initially reported that he did not have any injuries. (Devlin-Varin Decl. ¶ 4). Devlin-Varin concluded that plaintiff's subsequent statement during the examination, that his back, neck, and shoulder hurt, seemed sarcastic. (*Id*.).

Based on the video evidence, no reasonable finder of fact would credit plaintiff's claim that he was following all of the officers' orders when he was suddenly slammed to the floor and repeatedly kneed in the back. Likewise, plaintiff's claim that he suffered significant mouth and back injuries is inconsistent with plaintiff's own description of his injuries, contemporaneous photographs, and the assessment of nurse Devlin-Varin. While there is no dispute that defendant Lee used force against plaintiff, this court concludes that it amounted to a *de minimis* and reasonable use of force. This finding is consistent with that of other courts applying *Hudson*. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997) (holding that inmate's claims that he was "bumped, grabbed, elbowed, and pushed" by prison officials insufficient to state Eighth Amendment claim); *Bermudez v. Waugh*, No. 09:11-CV-947 (MAD/DEP), 2013 WL 654401 at *5 (finding that tackling of inmate that caused minor bruising constituted *de minimis* force); *James v. Phillips*, No. 05 Civ. 1539, 2008 WL 1700125 at *4 -*5

(S.D.N.Y. 2008) (finding de minimis use of force when prison guard shoved inmate into cell door, causing swelling of the inmate's chin). Therefore, this court recommends that defendant Lee be granted summary judgment on the excessive force claim.

## V.     Retaliation

### A.     Applicable Law

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.* Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases).

To establish retaliation, the plaintiff must also demonstrate a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). Although a "'plaintiff can establish a causal

connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp. 2d at 370 (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id*. at 371. "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005)). To be sufficient to create a "factual issue," in the context of a

summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.'" *Id.,* 2006 WL 1133247, at *3 & n.7 (collecting cases); Fed. R. Civ. P. 56(c)(4).

## B.    Application

Plaintiff claims that defendant Lucia, who was the hearing officer for all three of the disciplinary hearings at issue in this case, made his determinations based on bias or animus toward plaintiff.  (Compl. ¶¶ 9, 42, 47-49).  Plaintiff also alleges that defendant Lucia threatened physical violence at the close of the December 2012 hearing, "telling plaintiff that he is going to have his officers jump and beat up the plaintiff if the plaintiff keep on complaining about defendant D. Lucia wrongdoing against that plaintiff."  (Compl. ¶ 7).  Plaintiff further alleges that many of the unconstitutional actions alleged in his complaint, including the excessive use of force, the denial of food, and the false misbehavior report, were retaliatory actions taken by other Clinton employees at the direction of defendant Lucia. (Compl. ¶¶ 23, 27, 52, 63).  During his deposition, plaintiff also alleged that defendant Brown had ordered retaliation against plaintiff for filing grievances against DOCCS staff.[14] (McCartin Dec, Ex. A at 78-79, 90).

All of plaintiff's retaliation claims are based upon his own conclusory allegations, and are not supported by the record.  He offers no support for a retaliatory motive on the part of defendant Lucia, suggesting at various points that Lucia was

---

[14] Defendants have submitted evidence that plaintiff has filed 86 grievances in the DOCCS system between 2000 and 2014.

upset that plaintiff objected at the hearings and successfully appealed some or all of the determinations (Compl. ¶¶ 4-7), that the hearing officer wanted to prevent plaintiff from receiving visitors at Christmas (Compl. ¶ 9), and that Lucia was angry about an unsuccessful grievance that plaintiff had filed against him. (McCartin Decl., Ex. A at 113). Even if the court accepts that plaintiff's complaints and objections to conditions at the facility, including defendant Lucia's handling of the disciplinary hearings, were protected exercises of the First Amendment,[15] plaintiff fails to show that there was a causal nexus between such exercise and the alleged retaliatory actions.

Plaintiff's own subjective belief that defendant Lucia was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437-38 (W.D.N.Y. 2010). It is well settled "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* The record evidence, as described above, supports the conclusion that plaintiff's due process rights were satisfied in the three disciplinary hearings described in the complaint, and that each of the guilty verdicts was supported by some evidence, including witness testimony and video or audio recordings.

Plaintiff claims that other retaliatory actions, including the use of force by defendant Lee, the issuance of a false misbehavior report by defendant LaFountain, and

---

[15] There is support for the proposition that an inmate's verbal complaints might serve as the basis for a section 1983 retaliation claim. *McMillian v. County of Onondaga*, No. 9:13-CV-1124 (TJM/ATB), 2015 WL 1403459, at *11 (N.D.N.Y. March 26, 2015) (collecting cases).

deprivation of food by LaFountain and other unnamed Clinton correctional officers and employees, were all carried out at the direction of defendant Lucia. He also alleges that defendant Brown participated in or encouraged these retaliatory actions in response to grievances that plaintiff filed against various DOCCS employees. Without more, courts have regularly dismissed claims that a defendant has retaliated for complaints against a third party. *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d at 369 (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

The only evidence that plaintiff offers to support his retaliation theory is an allegedly overhead conversation between correctional officers during which defendant Lee "gloated" about how defendant Lucia instructed him to assault plaintiff. (McCartin Decl., Ex. A at 116). These unsupported allegations, particularly in light of the use of force video that contradicts plaintiff's Eighth Amendment claims and the disciplinary hearing records that show that there was at least "some evidence" to support the disciplinary measures imposed by defendant, are insufficient for any reasonable jury to "undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Jeffreys*, 426 F.3d at 554-55. Therefore, this court recommends that

summary judgment be granted as to the retaliation claims against defendants Lucia, Brown, LaFountain, and Lee.

## VI.    Personal Involvement/Respondeat Superior

### A.    Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012)

39

(discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of defendants Brian Fischer in any of the constitutional claims.

## B. Application

Plaintiff has stated that he named defendant Fischer due to his position as DOCCS Commissioner, because Fischer ruled or had subordinates rule on plaintiff's various administrative appeals. (McCartin Decl., Ex. A at 47). The personal involvement of a supervisory official cannot be established if his only involvement is to refer an inmate's complaint to the appropriate staff for investigation.[16] *Harnett v.*

---

[16] In fact, it is clear there is no constitutional right to an investigation by government officials at all. *Nieves v. Gonzalez*, 05-CV-00017, 2006 WL 758615 at *4 (W.D.N.Y. March 2, 2006) (collecting cases). *See also Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to

*Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoner to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official). Thus, plaintiff cannot establish personal involvement based upon Fischer's referral of plaintiff's various appeals for administrative review, and summary judgment should be granted for defendant Fischer.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**Dated:**     December 21, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

hold that official liable for the alleged violations.")